9 Pages
WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
DANIEL L. EGAN (SBN 142631)
MEGAN A. LEWIS (SBN 221263)
STEVEN J. WILLIAMSON (SBN 238869)
400 Capitol Mall
Twenty-Second Floor
Sacramento, CA 95814
Telephone: (916) 441-2430
Facsimile: (916) 442-6664

Attorneys for Creditor
TRAYNOR MARINA INVESTMENTS, LLC

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT A. COOK,<br><br>Debtor. | Case No.: 11-39335-C-11<br><br>WFH-4<br><br>Date: October 25, 2011<br>Time: 9:30 a.m.<br>Dept: C |

### TRAYNOR MARINA INVESTMENTS, LLC'S MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

Traynor Marina Investments, LLC ("TMI") hereby moves this Court for an order directing the appointment of a Chapter 11 Trustee pursuant to Section 1104 of the Bankruptcy Code.

## I.
## FACTS

### A. Debtor's Background

Debtor, through various legal entities, is a part owner of the Sacramento Kings Professional basketball team, owner of Le Rivage Hotel, and owner of a professional tennis team. Debtor, through various other entities, also has minor real estate holdings in the Sacramento area.

Debtor recently testified that he does not own any assets in his own name. Instead, he has structured his affairs to place his assets behind the shield of various corporations and limited liability companies. Debtor does not even own his own car, his house, or even a bank account. (See, Ex. A (Exam Transcript) at 6:25-7:1). In the last five years Debtor has entered into at least three significant financial transactions, involving millions of dollars, and has no plausible explanation of the disposition of the funds.

Based on the facts developed in this case thus far, it is clear that a Chapter 11 Trustee is imperative to investigate, locate and sell assets of the estate.

B. **The Secured Claim of TMI**

In 2007 Debtor and others induced TMI to invest $700,000 in a marina under construction adjacent to the Le Rivage Hotel. Later, to facilitate a financing transaction involving the hotel, Debtor and others induced TMI to transfer its ownership interest in the marina property in exchange for an ownership interest in an LLC owning the yet to be constructed marina. TMI was unwilling to engage in this transaction without a financial guarantee from Debtor. The transaction was ultimately structured in a manner that was the functional equivalent of a guarantee by Debtor in favor of TMI at the time of the transaction. Debtor provided TMI with a financial statement showing a net worth of $70,582,000.

Debtor defaulted on the obligation and, in September 2010, TMI obtained judgment against Debtor. A second amended judgment was entered on January 13, 2011 (See, Ex. B.) No appeal to the judgment has been taken, and the appeal period has expired. On February 22, 2011 TMI obtained an order of the Court appointing a receiver and restraining any of Debtor's limited liability companies or corporations from making any distributions to Debtor. (See, Ex. C.) On March 1, 2011 TMI served an order of examination on Debtor, creating a lien on all of Debtor's assets. (See, Ex. D.) TMI took the examination of Debtor on March 14, 2011.

On June 11, 2011 TMI obtained charging orders against most of Debtor's limited liability companies. (See, Ex. E.) When no funds were paid through the charging orders, TMI moved the Court for an order authorizing the foreclosure of the economic interest of Debtor in each entity. The state court entered an order authorizing the foreclosure (See, Ex. F) on the day after this

MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

Chapter 11 was filed.

C. **Procedural Background of Chapter 11 Case**

Debtor commenced this Chapter 11 case on August 8, 2011. Debtor's monthly operating report, due September 15, 2011, has not been filed. Debtor did file his schedules of assets and liabilities and statement of financial affairs (See Exhibit G.) In the schedules, Debtor lists monthly income of $9,000, despite the fact that since February 2011 he and his wholly owned entities have been subject to a Court order prohibiting such entities from making distributions to Debtor.

## II.
## DISCUSSION

TMI requests the appointment of a trustee pursuant to Section 1104 of the Bankruptcy Code, which reads, in part, as follows:

> § 1104. Appointment of trustee or examiner
>
> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 USCS § 1104

Here, cause exists for appointment of a Chapter 11 Trustee and such appointment is in interests of creditors.

A. **Cause Exists For Appointment of a Chapter 11 Trustee**

Cause exists for the appointment of a Chapter 11 Trustee for the following reasons.

1. Failure to Timely File Monthly Operating Report

Debtor has failed to file his first monthly operating report. This failure alone is grounds

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

for appointment of a Trustee. *See In re Tornheim*, 181 B.R. 161, 164 (Bankr. S.D.N.Y. 1995)("Refusal or inability to provide financial disclosure sounds the death knell of a chapter 11 case. The failure to file monthly operating statements required by the Trustee's operating guidelines, "whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceedings." *In re Roma Group, Inc.*, 165 Bankr. 779, 780 (S.D.N.Y. 1994)".)

In this case, the failure of Debtor to provide accurate and timely financial disclosure is especially concerning in light of Debtor's apparent disregard for the prior court order appointing a receiver. It is likely that if the monthly operating report is filed accurately, it will disclose improper expenditures by the Debtor, including expenditures of cash collateral.

2. Unauthorized Use of Cash Collateral

As noted above, until Debtor candidly and completely files his monthly operating report, the Court and creditors will not be able to determine if Debtor has used cash collateral without prior court approval. TMI holds liens on all of Debtor's assets, and has not consented to the use of its cash collateral for any purpose in this case. It is inconceiveable that Debtor has continued to fund his lifestyle during this case without access to some funds, and those funds must be cash collateral. For these reasons, a Chapter 11 Truste must be appointed.

3. Violation of Prepetition Court Order

As shown on Exhibit C, on February 22, 2011 the Sacramento Superior Court issued an order appointing a receiver over all of Debtor's assets and directing Debtor to turn over all of his property to the receiver. Nevertheless, Debtor managed to maintain his lifestyle for another 6 months before commencing this case. Indeed, Debtor reports on his Schedule I that he makes $9,000 per month and Debtor's Statement of Financial Affairs reflects he has received $78,920.53 year to date. None of that money has been turned over to the receiver as required by the Court order. Debtor's violation of a prior court order is sufficient grounds itself for the appointment of a Trustee.

710175.1 - 4 -

MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

4. Failure to Account for Funds

One of the most troubling aspects of Debtor's financial reporting involves three unrelated financial transactions. The common theme is millions of dollars converted to cash, and no explanation from the Debtor of where the money went. (Debtor's schedules list cash on hand at the time of filing in the amount of $200.) The unexplained financial transactions are described below.

a. Omni Financial

Debtor's largest unexplained financial transaction involves a purported loan from Omni Financial, LLC. ("Omni".) In 2007 Debtor guaranteed a promissory note in favor of Omni in the principal amount of $10,000,000. As security for the promissory note, Debtor pledged his interest in "KPBC" or Kings Professional Basketball Club, a general or limited partnership which Debtor represented was a 7% owner of the Sacramento Kings.[1] Earlier this year Omni filed suit against KPBC and Cook seeking recovery of monies under the Promissory note. Omni sought recovery of approximately $13 million. Debtor defended against the lawsuit.

In his March 2011 debtor's examination, Debtor first testified that he did not know the amount of money he received from the Omni loan, but then testified that he only recalled receiving $2 million in loan proceeds. (Ex. A (Exam transcript) at 62:10-64:22.) Debtor then testified that the entire $2 million of proceeds was paid to an entity known as "Lighthorse Ventures." (Id. at 63:15-16.) In return, he received a "Convertible Note". (Id. at 65:6-7.) In April 2011 Debtor testified that he presumed that the Lighthorse Convertible Note was "somewhere in his office." (Id. at 65:12.) The Lighthorse Convertible Note is not listed as an asset in Debtor's schedules.

Omni on the other hand, contends that it funded the $10 million promissory note with cashier's checks totaling $2,550,000, and wire transfers totaling an additional $4,510,000. Omni

---

[1] In TMI's debtor's examination of Debtor Debtor testified that KPBC was a general partnership (Exam, 40:5-6.) and then testified that it was a limited partnership. (Exam 41:9-14.) Debtor testified that he was a general partner, and then testified he was a limited partner. Id. Debtor testified that Joe Benevenuti was a general partner. Exam, 41:8. In the Omni loan documents Debtor represented that he and an affiliate of Omni were the only partners of KPBC. TMI contends that KPBC is not a separate entity, but merely a fictious business name of Debtor. If so, TMI will have the first priority lien on the limited partnership interest in the entity that owns the Sacramento Kings.

710175.1 - 5 -

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

has provided what it contends is proof of these transfers. (See, Ex. K.) Debtor, because he has not admitted receiving these funds, has not explained what happened to the funds. Omni, for its part, will have difficulty explaining how a $7,060,000 loan turned into a $13 million liability in four years.

    b.  LPL/Amerifund

In 2009 TMI received an unsigned financial statement of Debtor's assets. (See, Ex. I.) Debtor has since disclaimed any particpation in the preparation of the financial statement, but it formed the basis of questioning in Debtor's March 2011 examination. The 2009 financial statement lists ownership of $2 million worth of stocks subject to a loan of $1 million.[2] Debtor testified that the stocks were held in a brokerage named LPL Financial. (Ex. A, (Exam Transcript), at 73:15-74:38.) However, by the time of the April 2011 examination, the money was gone. Id. at 73:12.

When asked about the disposition of the proceeds of the LPL brokerage, Debtor stated that most of the money went to pay off a loan against the brokerage account. Debtor testified that a company called "Amerifund" had made a large loan against the stocks in the brokerage account. (Id. at 75:10-16.) The following questions and answers shed light on Debtor's business practices:

  Q.  What did you do with that million dollars that you got from the loan?
  A.  I don't recall.
  Q.  No recollection at all?
  A.  No.

    c.  Scott's Seafood.

Debtor testified in April 2011 that he had held a 10% interest in the Scotts Seafood restaurant, but had sold it "maybe a year ago." (Ex. A (Exam transcript), 50:15-16.) Debtor received a check for $250,000 for the interest in the restaurant. (Id. at 50:24.) Debtor testified that he had no recollection of what he did with the money. (Id. at 51:9-25.) The question and answer was particularly telling:

  Q.  What did you do with the money when you got that check?

---

[2] The 2007 Financial Statement lists ownership of stocks worth $2.5 million, subject to no encumbrances.

710175.1     - 6 -

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

|   |    |                                                                                      |
|---|----|--------------------------------------------------------------------------------------|
| 1 | A. | I don't recall.                                                                      |
| 2 | Q. | You don't remember?                                                                  |
| 3 | A. | No.                                                                                  |
| 4 | Q. | You have no recollection at all what you did with a quarter million dollars?         |
| 5 | A. | Correct.                                                                             |
| 6 | Q. | Do you have any recollection of how you spent that money?                            |
| 7 | A. | No, I don't.                                                                         |
| 8 | Q. | Do you have any of that money left?                                                  |
| 9 | A. | No.                                                                                  |

(Id. at 51:13-25.)

### 5. Conflict of Interest

Finally, cause exists for the appointment of a Trustee because Debtor has an irreconciable conflict of interest in this case. In 2007 Debtor provided TMI with a financial statement that represented that Debtor had a net worth of over $72,000,000. The financial statement ascribed a value of $50,000,000 alone to Debtor's interest in the Sacramento Kings and Arco Arena.

Now, in the Chapter 11 case Debtor has undervalued his assets in order to exempt the Sacramento Kings, and most of his other entities, under the "wildcard" exemption of Section 704.140(b)(5). In order to support his claim that these assets have no value, Debtor must avoid exposing the assets to the market for sale. However, Debtor's duties as debtor in possession require Debtor to attempt to sell these assets for the highest price possible. Therefore, Debtor is placed in an irreconcilable conflict of interest.

This conflict is further exacerbated by the impending litigation over the Debtor's claim of exemption. Debtor can be expected to seek to use estate funds to retain counsel to promote Debtor's personal interests to the detriment of creditors. Furthermore, at a time when Debtor, as debtor in possession, has an obligation to maximize the value of assets for creditors, instead Debtor will be arguing to the Court (and therefore the portion of the world with access to the internet) that the assets has neglible value. This is an impossible position for the Debtor, and

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

710175.1
- 7 -
MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

certainly a conflict of interest. This conflict of interest is cause for appointment of a Trustee.

B. **The Interests of Creditors Will Be Best Served by Appointment of a Neutral Trustee to Facilitate a Liquidation of Debtor's Assets**

Section 1104 authorizes the appointment of a Trustee when the interests of creditors would be best served by such appointment. Here, the interests of creditors would be best served by the appointment of a Trustee for the following reasons.

First, it is clear that there is no business to reorganize, and the success of this case will depend on aggressive efforts to liquidate the Debtor's assets. As shown above, Debtor has taken the position that the estate has no interest in the main assets of the estate because of Debtor's exemptions, despite the fact that the Kings alone were worth $50,000,000 just four years ago. For this reason, Debtor will not take any steps to market or sell the estate's assets, and a Trustee will be necessary to accomplish this goal.

Second, Debtor has engaged in significant questionable transactions that will require scrutiny of an independent investigator. The Omni Financial transaction alone has generated $7,060,000 in missing funds. The Debtor's inability to explain the disposition of $2 million of funds from the liquidation of the LPL Financial brokerage account and the related Amerifund loan is simply unacceptable. An independent trustee is necessary to adequately investigate these transactions and, if necessary, commence litigation to recover the funds. The Debtor cannot be trusted to do so.

## CONCLUSION

This motion is based on the supporting notice, Exhibit List, Request for Judicial Notice and Declaration of Daniel L. Egan.

WHEREFORE, Traynor Marina Investments, LLC requests the Court to order appointment of a Chapter 11 Trustee pursuant to Section 1104.

710175.1 - 8 -

MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

| | | |
|---|---|---|
| 1 | DATED: September 27, 2011 | WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP |
| 2 | | |
| 3 | | |
| 4 | | By: _____ |
| 5 | | DANIEL L. EGAN<br>Attorneys for Creditor |
| 6 | | TRAYNOR MARINA INVESTMENTS, LLC |